UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**Beck,**

    Plaintiff,

v.

**Tim Pawlenty, et al.,**

    Defendants.

Civil No. 04-686 (MJD-JJG)

**REPORT
AND
RECOMMENDATION**

This matter is before the undersigned for resolution of dispositive motions. Plaintiff Beck is proceeding pro se. Defendants Steven Craane and Dayton Burkholder are represented by Mark W. Hardy, Esq. Defendants Lynn Dingle, John King, Steven Allen, Mary McComb, and Colleen Youngquist are represented by Mark B. Levinger, Assistant Minnesota Attorney General. These motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636 and Local Rule 72.1(c).

Mr. Beck (Beck) brings action under 42 U.S.C. § 1983, in connection with his incarceration at Minnesota state prisons in Stillwater and Oak Park Heights. In relevant part, he alleges that some defendants violated his due process rights by imposing retaliatory discipline and conspiring to deny his access to the courts. He further alleges that other defendants violated the Eighth Amendment by deliberately disregarding his medical needs. Various defendants oppose these claims and move for summary judgment.

A party is entitled to summary judgment where the record shows there is no issue of material fact and the moving party is entitled to judgment as a matter of law. *Cordry v. Vanderbilt Mortgage &*

*Finance, Inc.*, 445 F.3d 1106, 1109-10 (8th Cir. 2006). When examining whether there are issues of material fact, all reasonable inferences are taken in favor of the nonmoving party. *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809, 812-13 (8th Cir. 2006). An issue of material fact exists where there is sufficient evidence for a jury to reasonably find for the nonmoving party. *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 873 (8th Cir. 2005). If the nonmoving party relies on conclusory allegations, and fails to present evidence supporting a necessary element of a claim, then that claim cannot survive summary judgment. *Beyer v. Firstar Bank, N.A.*, 447 F.3d 1106, 1108 (8th Cir. 2006).

**A.**

Defendants Stephen Craane and Dayton Burkholder seek summary judgment in connection with Beck's claims that they deliberately disregarded his medical needs (Doc. No. 51). Both of these defendants were physicians involved in Beck's treatment. While Beck was at Stillwater, for the period from July 2002 until October 2003, he was treated by Dr. Burkholder (Burkholder). Following his transfer to Oak Park Heights in October 2003, treatment continued with Dr. Craane (Craane).

When a prisoner alleges a violation of the Eighth Amendment based on deliberate disregard of medical needs, the prisoner is required to demonstrate two elements. First, the prisoner must show an objectively serious medical need. Second, the prisoner must show that the defendants knew of the need but disregarded it. *Plemons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006).

For the first element, an objectively serious medical need, it must be obvious, or it must be supported by medical evidence such as a diagnosis. *Pool v. Sebastian County*, 418 F.3d 934, 944 (8th Cir. 2005). The second element not only requires a showing that the defendants knew of the need, but also that the defendants disregarded an excessive risk to the prisoner. Such disregard cannot be based on a

difference of opinion as to proper treatment, or on allegations that the medical treatment was negligent. *Bender v. Regier*, 385 F.3d 1133, 1137-38 (8th Cir. 2004).

In support of his claim that the defendants deliberately disregarded his medical needs, Beck raises several arguments. He principally argues that the defendants did not take adequate steps to treat his shortness of breath. In particular, he alleges that during a severe episode of this symptom on January 16, 2006, prison staff took over twenty-seven minutes to respond. (Compl. at 6-7.)

The record reflects that Beck first reported shortness of breath in February 1999 and was diagnosed with asthma in July 1999. (Aff. of M. Hardy, Jan. 31, 2005, Exh. A-1 (Notes of C. Ceman, Feb. 18, 1999, July 9, 1999).)[1] Beck frequently reported shortness of breath and other respiratory difficulties through mid-2002, but these complaints then became less frequent. (*See id.* (Note of W. Nutakor, Aug. 19, 2002; Note of P. Lawver, June 19, 2003).)

When Burkholder began directing treatment in July 2002, he continued prescribing asthma medications such as flovent and albuterol. (Aff. of M. Hardy, Jan. 30, 2005, Exh. A-2 (Medication Administration Records, July 2002, August 2002).) For the period that Burkholder was directing treatment, Beck did not often report respiratory distress. (*See id.*, Exh. A-1 (Notes of D. Burkholder, Dec. 20, 2002, July 15, 2003).)

Beck reported a severe episode of symptoms on January 16, 2004. When a nurse checked on Beck, he exhibited no obvious symptoms and his vital signs were normal. (Aff. of M. Hardy, Jan. 31,

---

[1] Following examination of the record, it appears that Exhibits A-1 and A-2 to Mr. Hardy's affidavit of January 31, 2005 were lost. This Court requested that these exhibits be refiled, which Craane and Burkholder did through counsel on July 14, 2006.

2005, Exh. A-1 (Note of S. Craane, Jan. 30, 2004).)

In a series of tests from January through April 2004, Craane attempted to diagnose the cause of the shortness of breath. He administered spirometry tests to measure lung capacity. According to Craane, Beck did not cooperate with the tests, and so the results were inconclusive. (*Id.* (Notes of S. Craane, Feb. 20, 2004, Apr. 9, 2004).) Craane further observed that, when Beck had medical appointments or interacted with prison staff, he did not show signs of respiratory distress. Though he expressed doubts that Beck had asthma, Craane continued prescribing asthma medication during this period. (*See id.* (Note of S. Craane, April 9, 2004, June 4, 2004); Aff. of M. Hardy, Jan. 31, 2005, Exh. A-2 (Medication Administration Records, January to May 2004).)

While Burkholder was directing treatment, Beck infrequently reported respiratory distress. And Burkholder had prescribed asthma medications to control these symptoms. Because Beck offers no evidence that Burkholder disregarded these symptoms, there are no questions of material fact to be decided by a jury here. Burkholder is, therefore, entitled to summary judgment on this issue.

Though Craane began treating Beck in October 2003, Beck did not report shortness of breath until the January 16 incident. Nothing in the record indicates that Craane, or any other defendant, was responsible for delaying Beck's treatment on that date. Even if there was an improper delay, the record fails to show that Beck was subject to an excessive risk. When a nurse checked on Beck, he was exhibiting no obvious symptoms and his vital signs were normal. This issue does not pose a question of material fact.

When Craane had the opportunity to examine Beck after the January 16 incident, he devoted substantial effort to diagnosing the cause of the shortness of breath. Craane was unable to find the cause,

4

and expressed doubt that these symptoms were taking place.  Nevertheless, Craane continued to pursue testing and prescribed medications for asthma.

When all reasonable inferences are taken in Beck's favor, the record shows that Craane took reasonable steps to diagnose and treat purported shortness of breath.  Thus Beck lacks proof that Craane disregarded this condition.  Again there are no questions of material fact, and Craane is also entitled to summary judgment on this issue.

Beck next argues that when the defendants prescribed disalcid, an anti-inflammatory pain reliever, it resulted in IgA nephropathy, a chronic kidney disease.  (Compl. at 6-7.)  This disease is marked by excessive production of a protein, immunoglobulin A, that inhibits the functioning of the kidneys and results in excess blood and protein in urine.  Although the disease does not always cause immediate complications, it can lead to kidney failure.  (*See* Aff. of M. Hardy, Jan. 31, 2005, Exh. A-1 (Note of D. Burkholder, Mar. 38, 2003).)

The record shows that Beck first reported blood in his urine as early as 1989 and was referred to specialists several times from 1999 through 2002.  (Aff. of M. Hardy, Jan. 31, 2005, Exh. A-1 (Note of D. Lee, Sept. 12, 2000).)  He was first diagnosed with IgA nephropathy in December 2001.  (*Id.* (Note of W. Nutakor, Dec. 19, 2001).)  To confirm this diagnosis, several doctors recommended a renal biopsy.  This procedure was not performed, for reasons not evident from the record.  (*Id.* (Note of W. Nutakor, June 4, 2002; Note of S. Craane, Apr. 5, 2004).)

To track whether IgA nephropathy was affecting his kidney functions, his doctors frequently carried out tests.  None indicated an impairment of kidney functions.  (Aff. of M. Hardy, Jan. 31, 2005, Exh. A-1 (Notes of W. Nutakor, Aug. 19, 2002, Oct. 16, 2002; Notes of D. Burkholder, Mar. 28, 2003, Sept. 19,

2003; Notes of S. Craane, Feb. 20, 2004, Mar. 24, 2004).)  Because his kidney functions were stable, no special course of treatment was recommended.  (Aff. of M. Hardy, Jan. 31, 2005, Exh. A-4.)

Beck was first prescribed disalcid for chronic pain by Sultan Michael, his physician at the time, in May 2001.  (Aff. of M. Hardy, Jan. 31, 2005, Exhs. A-1 (Notes of S. Michael, May 11, 2001, June 1, 2001), A-2 (Medication Notes, May 2001).)  Though the record suggests that Beck was intermittently prescribed disalcid thereafter, Burkholder admits that he renewed a prescription for disalcid.  (Aff. of D. Burkholder, Jan. 25, 2005 at 2; Aff. of M. Hardy, Jan. 31, 2005, Exhs. A-1 (Note of D. Burkholder, Oct. 3, 2002), A-4 (Note of B. Barth, Dec. 7, 2001; Note of D. Warden, Jan. 31, 2002).)  After learning of reports that disalcid caused kidney inflammation in some patients,  Burkholder reduced the dosage of disalcid in September 2003.  (Aff. of D. Burkholder, Jan. 25, 2005 at 2.)  The record does not indicate when Beck stopped taking disalcid.

The record shows that Beck exhibited symptoms of IgA nephropathy long before he was prescribed disalcid.  Although the record indicates that disalcid causes kidney inflammation,  it is not possible to infer from the record that disalcid also causes IgA nephropathy.  Assuming for the sake of argument that disalcid causes or aggravates IgA nephropathy, and that this fact was known in 2001, the actions of Burkholder and Craane would only be negligent.

Even with all reasonable inferences are taken in Beck's favor, the record does not show that his physicians intentionally prescribed a medication in disregard of Beck's medical needs.  So there is no question of material fact that requires decision by a jury.  Burkholder and Craane are entitled to summary judgment on this issue.

Beck's remaining arguments are that the defendants failed to provide proper treatment for his severe pain; that they delayed the delivery of necessary medications; and that they intentionally falsified medical records. Beck does not offer evidence in support of any of these contentions. Because the record provides no further indication of how Burkholder or Craane were involved in these matters, they are also entitled to summary judgment here. As a result, they prevail on their motion in its entirety.

**B.**

Defendants Lynn Dingle, John King, Steven Allen, Mary McComb, and Colleen Youngquist bring a separate motion for summary judgment (Doc. No. 80), challenging Beck's claim that they violated his due process rights by imposing retaliatory discipline and conspiring to restrict his access to the courts. According to the currently available record, the relevant events are as follows.

While he was incarcerated in Stillwater, Beck sent a kite to David Crist, the warden of the prison, on September 8, 2003. Beck stated in part,

> I believe you and your administrative sect has placed me in immediate danger . . . . I have every intention to harm specific members of your administrative sect first chance I get.

(Aff. of S. Allen, Exh. 3 (Kite of Beck, Sept. 8, 2003).) Based on this kite, Beck was charged with three disciplinary violations: harassment, threatening others, and disorderly conduct. A hearing officer conducted a hearing on September 16, 2003. The officer found that Beck committed the violations and assessed a penalty of 180 days in segregation. Beck appealed to Crist, who upheld the decision of the hearing officer. (Aff. of M. Levinger, Exhs. 4, 5 (Findings of K. Halvorson, Sept. 16, 2003; Memo. of D. Crist, Sept. 23, 2003).)

Beck sent another kite to Ron Weill, a psychologist working at Stillwater, on September 22, 2003. This time Beck stated in part,

> I told [you] that before I attempt another homicide I would ask for your intervention, I'm doing that now! I have mentally justified to myself reasons to kill specific members of MCF-Stillwater's administrative sect and have every intention of doing so first chance I get!

(Aff. of S. Allen, Exh. 1 (Kite of Beck, Sept. 22, 2003).) Weill reported the kite to Mr. Allen (Allen), the director of psychological services at Stillwater. To determine if Beck posed a threat to himself or others, Allen placed Beck on observation status. Beck remained on observation status until he was transferred to Oak Park Heights on October 3, 2003. (*See* Aff. of S. Allen, Exh. 5 (Mental Health Record, Sept. 26, 2003).)

Based on the second kite, Beck was again charged with harassment, threatening others, and disorderly conduct. Following his transfer to Oak Park Heights, Beck pleaded guilty to threatening others on October 15, 2003. The other charges were withdrawn. A hearing officer at Oak Park Heights imposed a penalty of ninety days in segregation, to be served consecutively to the previous penalty of 180 days. (Aff. of M. Levinger, Exhs. 6, 7 (Notice of Sept. 29, 2003; Waiver of Sept. 15, 2003).) Beck served in segregation from October 2, 2003 until June 28, 2004. (Aff. of M. Levinger, Exh. 1 (Discipline History Report, June 21, 2004).)

For a violation of due process based on retaliatory discipline, a prisoner must demonstrate that prison officials imposed discipline even though the prisoner did not commit a violation. So long as prison officials show some evidence that disciplinary sanctions were based on an actual rule violation, a retaliatory discipline claim fails as a matter of law. *Moore v. Plaster*, 313 F.3d 442, 444 (8th Cir. 2002).

Here the record has ample evidence that Beck was penalized for actual violations of the rules. Regardless of whether the defendants were involved in the disciplinary proceedings against Beck, his claims of retaliatory discipline fail as a matter of law. Because no issues of material fact are presented for decision by a jury, the defendants are entitled to summary judgment on this issue.

For a violation of due process based on denial of access to the courts, a prisoner must show an actual injury. To do so, the prisoner is required to demonstrate that, as a result of the conduct of prison staff, the prisoner was denied the opportunity to prosecute a claim. *Cody v. Weber*, 256 F.3d 764, 767-68 (8th Cir. 2001). It is insufficient to show that this conduct made litigation inconvenient. Instead the prisoner must show that this conduct actually prevented the prisoner from litigating the claim. *See Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996).

Even when all inferences are taken in Beck's favor, he offers no evidence that the defendants, individually or working together, prevented him from proceeding with litigation. Beck does not identify any particular claims or actions that were prevented, either in his complaint or in his brief opposing summary judgment. (Compl. at 6; Pl.'s Mem. of Mar. 18, 2005.) And though Beck implies that his placement in segregation inhibited his ability to litigate his claims, it is notable that Beck began the current litigation, and filed seventeen separate documents, prior to his release from segregation on June 28, 2004.

Regardless of the level of involvement by the defendants in disciplinary proceedings against Beck, there is no evidence that Beck suffered an actual injury by being denied access to the courts. Because Beck offers no proof on this element of his claim, there is not sufficient evidence to supply an issue of material fact for a jury. The defendants are also entitled to summary judgment on this issue, and accordingly, they prevail on their motion for summary judgment.

**C.**

Although the previously mentioned defendants all prevail on their motions for summary judgment, there remain two defendants, Ayodele Ayedun and Worlali Nutakor. So the foregoing recommendations of this Court, if adopted, do not lead to a final determination of this matter. As a result, it is necessary to consider one other outstanding motion.

Beck moves for judgment as a matter of law (Doc. No. 46). In this motion, Beck alleges that the defendants concealed his medical records. Though Beck presents his motion as one for judgment as a matter of law at trial under Rule 50(a), this motion is properly examined as one for discovery sanctions under Rule 37.

Beck contends that the defendants refused to identify certain persons who supplied medical treatment and have failed to disclose information from an unnamed nephrologist. Assuming that such records exist, Beck has not requested this information through a motion to compel discovery. Nor has Beck offered any meaningful indication that the defendants concealed this information. In the absence of such evidence, discovery sanctions are inappropriate.

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Beck's motion for judgment as a matter of law (Doc. No. 46) be **DENIED.**

2. The motion for summary judgment by defendants Craane and Burkholder (Doc. No. 51) be **GRANTED.**

3. The motion for summary judgment by defendants Dingle, King, Allen, McComb, and Youngquist (Doc. No. 80) be **GRANTED.**

4. The claims against defendants Craane, Burkholder, Dingle, King, Allen, McComb, and Youngquist be **DISMISSED WITH PREJUDICE** and these parties dismissed from this action.

Dated this 18th day of July, 2006.　　　　　　　　　s/Jeanne J. Graham

　　　　　　　　　　　　　　　　　　　　　　JEANNE J. GRAHAM
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

### NOTICE

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by August 4, 2006. A party may respond to the objections within ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. A District Judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.